I,WILLIAMS, Judge.
Prison Management Services, Incorporated (“PMSI”) appeals a district court judgment which reversed the decision of the Department of Labor, Office of Employment Security (“Department”) denying unemployment benefits to Gracie Brinson. For the following reasons, we affirm.
FACTS
Gracie Brinson was employed with PMSI (then known as Corrections Corporation of America, or CCA) from 1990 until 1999. She worked as a corrections officer at the Winn Correctional Center (“WCC”). On March 19,1999, an incident occurred at WCC that ultimately led to Brinson’s discharge. WCC inmate Michael Blanson was standing with a group of other African American inmates when, according to Blanson’s complaint, another corrections officer (not Brinson) approached the group and said, “What is this, n s having a clan (sic) meeting?” Blanson wrote a letter to WCC Warden Mickey Hubert detailing the incident and asking that the corrections officer who made the statement be relieved of her supervisory duties and reassigned where she would not have any “verbal contact” with the inmates. Blanson indicated in his letter that a copy was also being sent to “Attorney Vincent Blanson, New Orleans, La.”[1]
*554 Brinson stated that soon after witnessing the incident, she met with Warden Hubert and told the warden what she had heard. She stated that she heard the other officer refer to a Klan meeting, but she did not hear the officer use the racial epithet.
| gAccording to Brinson, on April 28, 1999 she was told that she was being relieved of her duties as landscaping supervisor at WCC and effective May 2, 1999, she would begin working as a regular correctional officer — a demotion. Brinson stated that on May 3, 1999, when she inquired of Hubert as to why she had been transferred, Hubert informed her that, among other things, there had been complaints about her.
The record contains a letter from Brin-son, dated May 4, 1999, to Warden Hubert detailing the March 19, 1999 incident. According to Brinson, she had witnessed the incident and the corrections officer had stated, “What is this, Y’all having a clan (sic) meeting?” Brinson’s letter shows that copies were sent to the warden, to a grievance officer and to Vincent Blanson.
On May 6, 1999, Brinson completed a CCA “Employee Grievance Form” concerning her demotion. On May 20, 1999, Hubert fired Brinson. He indicated that Brinson was dismissed because she had violated CCA policy concerning communication with the family members of inmates.
Thereafter, Brinson filed a claim for unemployment benefits. On the applicable forms, she indicated that she had not been informed of the pertinent company policy. CCA filed an opposition to Brinson’s request for benefits on the ground that she was fired for employment-related misconduct. CCA’s opposition states as follows:
The claimant was discharged due to a violation of company policy. She was corresponding with family members of inmates in writing. This leads to immediate termination.
On June 4, 1999, the Louisiana Department of Labor, Division of Employment Security, denied Brinson’s claim for benefits on the grounds |sthat her discharge was for employment-related misconduct. Brinson sought review of that decision, and on July 23, 1999, an administrative law judge (“ALJ”) heard Brinson’s case. At the hearing, Brinson stated that Vincent Blanson had contacted her at home on the day after the incident and asked Brinson to tell him what she had seen and heard. Brinson stated that Vincent Blanson “presented himself as Michael Blanson’s lawyer .... He told me that he was .... after he asked me for a statement, I just sent him a statement.” On August 3, 1999, the ALJ issued a written opinion finding that Brinson’s conduct did not meet the definition of legal misconduct sufficient to disqualify her from receiving unemployment benefits.
CCA timely appealed the ALJ’s decision to the Board of Review for the Office of Regulatory Services (“Board”). On October 15, 1999, the Board issued a written opinion finding that Brinson’s conduct, in corresponding with the inmate’s brother, was employment-related misconduct sufficient to disqualify her from receiving unemployment benefits.
Thereafter, Brinson timely appealed the Board’s decision to the district court. After reviewing the record, the district court found that the Board’s decision was not supported by sufficient evidence. The court found that Brinson was discharged because of employer dissatisfaction. The district court signed a judgment awarding Brinson unemployment benefits effective May 20, 1999. PMSI (CCA) appeals the district court’s judgment.
*555 DISCUSSION
LSA R.S. 23:1601 provides in pertinent part:
An individual shall be disqualified for benefits:
_k---
(2)(a) If the administrator finds that he has been discharged by a base period or subsequent employer for misconduct connected with his employment. Misconduct means mismanagement of a position of employment by action or inaction, neglect that places in jeopardy the lives or property of others, dishonesty, wrongdoing, violation of a law, or violation of a policy or rule adopted to insure orderly work or the safety of others....
The employer bears the burden of proving that a discharge resulted from disqualifying misconduct by a preponderance of the evidence. Banks v. Administrator of Department of Employment, 393 So.2d 696 (La.1981); Hardeman v. Blache, 605 So.2d 671, 674 (La.App. 2d Cir.1992). Under Section 1601(2)(a) the term “misconduct” must be construed in such a way as to favor coverage. Wood v. Louisiana Dept. of Employment Sec., 25,545 (La.App.2d Cir.2/23/94), 632 So.2d 899, 901. For a claimant to be disqualified under this standard, the “misconduct” must have resulted from willful or wanton disregard of the employer’s interest, a deliberate violation of the employer’s rules, a direct disregard of standards of behavior which the employer has the right to expect from his employee or negligence in such a degree or recurrence as to manifest culpability, wrongful intent or evil design. Toney v. Francis, 618 So.2d 597, 599 (La.App. 2d Cir.1993).
Judicial review of unemployment compensation cases is limited to a determination of whether the Board’s findings of fact are supported by the evidence and whether these facts warrant the Board’s decision as a matter of law. LSA R.S. 23:1634(B); ConAgra Broiler Co. v. Gerace, 657 So.2d 391 (La.App. 3rd Cir.1995); Ortega v. Administrator of Louisiana Division of Employment Security, 626 So.2d 959 (La.App. 3rd Cir.1993). This issue is | sprimarily factual and is left to the determination of the referee and the board of review, but there must be legal and competent evidence to support the factual findings on which the administrative decision turns. CEG Welding Supply, Inc. v. Moore, 31,167 (La.App.2d Cir.12/14/98), 723 So.2d 524, 526. Thus, the sole issue presented by this appeal is whether Brin-son’s actions constituted misconduct sufficient to disqualify her from unemployment compensation.
The WCC contends Brinson violated company policy when she contacted Vincent Blanson. The WCC further argues that contact with the family members of inmates is against their policy because “contact with the inmates on personal matters jeopardizes safety.” However, Brin-son argues that Blanson presented himself as the inmate’s attorney and she simply responded to his request for a statement in her capacity as a WCC employee.
In its determination that Brinson’s benefits should be denied, the Board relied on a document entitled “CCA Standards of Business Ethics and Conduct Acknowledgment Form.” That document provides:
I, /s/ Gracie Brinson, have received and read the CCA Standards of Business Ethics and Conduct. I understand that these standards represent the policies of CCA.
/s/ Gracie Brinson
3-24-95
In its decision, the Board held that Brin-son’s signature acknowledged receipt of the company’s policy against corresponding with inmate family members. These Standards of Business Ethics are included *556 in the record, but |fithey do not contain an express prohibition against communication with the family members of an inmate.
Also, there is a form in the record signed by many CCA employees, including Brinson, which indicates that the signatories had read and understood the “policy and post order.” Although the post order is not found in the record, it was discussed at a hearing. The post order requires employees to “protect against any act or admission which jeopardizes security of the facility, the health, safety and overall welfare of residents, visitors and staff.” The signature page of the order purports to show that contact with an inmate’s family by an employee would jeopardize safety. However, insofar as can be determined from the record, the post order concerning safety makes no explicit prohibition against employee communication with members of an inmate’s family. Furthermore, the employer provided no evidence to support its bare assertion that any communication by an employee with the members of an inmate’s family would jeopardize the security of the facility or the safety of those involved.
The only written policy in the record with regard to communications with family members is Section C of the Corrections Corporation of America Staff and Development Policy, Section C provides as follows:
C. Employee Relationships With Residents Or Former Residents
Purpose:
1. To ensure that employee relationships with residents and/or former residents are conducted in a professional manner.
2. Employees are encouraged to interact with residents in a personable manner.
|73. Employee interaction with residents, their family members or close associates is limited to matters pertaining to CCA interests.
4. Contact with former residents, their families and/or known close associates is prohibited unless the employee was already associated with the resident before the resident entered a CCA facility, or the employee has verbally given the facility administrator notice of any contact or impending contact with a former resident.
The policy’s stated purpose is to ensure that “employee relationships with residents and/or former residents are conducted in a professional manner.” There is absolutely no mention of employee safety. Moreover, the policy strictly forbids communication only with former inmates and their families. The policy does not forbid employees from communicating with the families of current inmates, so long as the communication is “limited to matters pertaining to CCA interests.” Brinson’s communication with the inmate’s brother was an impersonal account of an event at the facility concerning the inmate. Further, the communication was prompted by a request from the inmate’s brother who, according to Brinson, told her that he was an attorney.
Based on this record, we conclude that the district court correctly found that the denial of unemployment benefits to Brin-son was not based on sufficient evidence. Consequently, the district court’s reversal of the Board’s decision is hereby affirmed.
CONCLUSION
For the above reasons, the judgment of the district court is affirmed at appellant’s cost.
AFFIRMED.

. The record reflects that Vincent Blanson is Michael Blanson's brother.